IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:24-CV-511-FL

CHRISTOPHER CLAYTON,

          Plaintiff/Claimant,

v.

FRANK BISIGNANO,
*Commissioner of Social Security*,

          Defendant.

MEMORANDUM AND
RECOMMENDATION

This matter is before the court on the parties' briefs filed pursuant to the Supplemental

Rules for Social Security Actions. [DE-13, -15]. Claimant Christopher Clayton ("Claimant")

filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the

denial of his application for a period of disability and Disability Insurance Benefits ("DIB").

The time for responsive briefing has expired, and the matter is ripe for adjudication. Having

carefully reviewed the administrative record and the briefs submitted by the parties, it is

recommended that the case be remanded to the Commissioner for further consideration.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on June 29,

2023, alleging disability beginning February 1, 2023. (R. 10, 172–76). His claim was denied

initially and upon reconsideration. (R. 59–82). A telephonic hearing before an Administrative

Law Judge ("ALJ") was held on June 6, 2024, at which Claimant, represented by counsel, and a

vocational expert ("VE") appeared and testified. (R. 35–58). On June 14, 2024, the ALJ issued a

decision denying Claimant's request for benefits. (R. 7–27). On July 11, 2024, the Appeals

Council denied Claimant's request for review. (R. 1–6). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set

2

forth in 20 C.F.R. § 404.1520, under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)–(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

## IV. ALJ'S FINDINGS

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial gainful employment since the alleged onset date. (R. 12). Next, the ALJ determined Claimant had the severe impairments of rheumatoid arthritis; hypertension; thrombocytosis; hyperlipidemia; coronary artery disease, status-post myocardial infarction; headaches; GERD;

3

anxiety disorder; depression; and obesity; and the non-severe impairment of presbyopia/nuclear sclerosis/dry eye syndrome/faint choroidal nevus. *Id.* At step three, the ALJ concluded Claimant's impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13–16). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild limitations in understanding, remembering, or applying information; and moderate limitations in adapting or managing oneself, interacting with others, and concentrating, persisting, or maintaining pace. (R. 15–16). Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding that he had the ability to perform light work[1] with the following restrictions:

> frequent pushing, pulling, operating hand controls, handling, fingering, feeling with the upper extremities; frequent pushing, pulling, operating foot controls with the lower extremities. Occasionally climbing ramps and stairs but no climbing ladders, ropes, or scaffolds. Occasionally balancing, stooping, kneeling, crouching, and crawling. Avoid all exposure to workplace hazards, such as dangerous moving machinery and unprotected heights. He can understand simple instructions and perform simple tasks. He can maintain concentration, persistence, and pace to stay on task for 2-hour periods over the course of a typical 8-hour workday with normal breaks in order to perform such tasks, in a low stress setting, which is further defined to mean no production-pace or quota-based work. He requires a goal-oriented job primarily dealing with things instead of people with no more than occasional social interaction as part of job with supervisors and co-workers but no work with the public, such as sales or negotiation, which does not preclude incidental or casual contact as it might arise.

(R. 16–22) (footnote omitted). In making this assessment, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause his alleged

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

4

symptoms, but his statements concerning the intensity, persistence, and limiting effects of these symptoms were not persuasive of disability based upon the medical and other evidence in the record. (R. 18). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of his past relevant work as a cable installer. (R. 22). Nevertheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that he can perform. (R. 22–23).

## V. DISCUSSION

Claimant argues that, in assessing his RFC, the ALJ erred by failing to adequately consider his need for a cane; failing to evaluate the side effects of his prescription medication; and failing to perform a function-by-function analysis of his ability to stand, walk, handle, finger, and feel.[2] Pl.'s Br. [DE-13] at 13–24. The Commissioner counters that the ALJ properly evaluated Claimant's need for a cane, as well as the side effects of his prescription medication, and did not err in his assessment of Claimant's functionality. Def.'s Br. [DE-15] at 6–14.

An individual's RFC is the capacity an individual possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. § 404.1545(a)(1). "[T]he residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R. 96-8p). The ALJ must provide "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence

---

[2] In making each of these arguments, Claimant heavily relies on his administrative hearing testimony regarding the same; consequently, this Recommendation also discusses the ALJ's treatment of Claimant's subjective statements about his impairments where necessary.

5

(e.g., daily activities, observations)." *Id.* (quoting SSR 96-8p); *see also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion").

Federal regulation 20 C.F.R. § 404.1529(a) provides the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 593–94. First, the ALJ must objectively determine whether the claimant has medically documented impairments that could cause his or her alleged symptoms. S.S.R. 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016); *Hines v. Barnhart*, 453 F.3d 559, 564 (4th Cir. 2006). If the ALJ makes that determination, he must then evaluate "the intensity and persistence of the claimant's pain[,] and the extent to which it affects her ability to work," *Craig*, 76 F.3d at 595, and whether the claimant's statements are supported by the objective medical record. S.S.R. 16-3p, 2016 WL 1119029, at *4; *Hines*, 453 F.3d at 564–65.

Objective medical evidence may not capture the full extent of a claimant's symptoms, so where the objective medical evidence and subjective complaints are at odds, the ALJ should consider all factors concerning the "intensity, persistence and limiting effects" of the claimant's symptoms. S.S.R. 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. § 404.1529(c)(3) (showing a complete list of factors). The ALJ may not discredit a claimant solely because his or her subjective complaints are not supported by objective medical evidence, *Craig*, 76 F.3d at 595–96, but neither is the ALJ required to accept the claimant's statements at face value; rather, the ALJ must "evaluate whether the statements are consistent with objective medical evidence and the other evidence." S.S.R. 16-3p, 2016 WL 1119029, at *6; *see Ladda v. Berryhill*, 749 F. App'x 166, 171 (4th Cir. 2018) ("The ALJ cannot 'reject a claimant's statements about the intensity and

6

persistence of . . . pain or other symptoms' or about the effect of those symptoms on a claimant's ability to work 'solely because the available objective medical evidence does not substantiate them.'") (quoting 20 C.F.R. § 404.1529(c)(2)); *Taylor v. Astrue*, No. 5:10-CV-263-FL, 2011 WL 1599679, at \*4–8 (E.D.N.C. Mar. 23, 2011), *adopted by* 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011).

### A. Claimant's Need for a Cane

At the administrative hearing, Claimant testified that the low-level pain caused by his rheumatoid arthritis is "always there," and his joints are stiff "every day." (R. 42). Claimant also explained that he experiences "constant" inflammation and swelling in his hands, feet, and ankles, and he can "walk for a little while . . . maybe five minutes but I have to stop and rest. I have to have a seat." (R. 42–43). He can no longer drive anywhere because he "can't just go jump in [his] vehicle every day . . . . [He has] a jeep and it's hard for [him] to get in and out of it"; he "can walk a little bit [but] his joints are going to pay for it later"; and he would be unable to stand and walk for six hours out of an eight-hour day. (R. 42, 47, 51–52).

As a result of the pain and swelling in his legs, Claimant stated that he has used a cane since the Veterans Affairs ("VA") hospital assigned him one in or around December 2022 or January 2023. (R. 50). Claimant's walking difficulties and/or cane use are additionally mentioned in the function reports he completed in August and December of 2023, as well as in the third-party function report submitted by Claimant's wife in December of that same year. *See, e.g.*, (R. 210) ("I'm barely able to walk. I walk with a limp sometimes with both ankles."); (R. 215) ("Information About Abilities" form where Claimant represents he can walk for 100 meters before needing to stop and rest for 2–3 minutes and can stand for about 5 minutes); (R. 216) (in response to question asking when Claimant needs to use mobility aids, he stated the following:

7

"When needing to go outside or to appointments."); (R. 233) (in response to question asking when Claimant needs to use mobility aids, his wife stated that he "uses his cane regularly"); (R. 245) ("Having R.A. limits me physically. My feet, ankles, hands, wrists, elbow and knee joints are always inflamed.").

"The requirement to use a hand-held assistive device may . . . impact . . . [an] individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling." *Daniel v. Berryhill*, No. 5:17-CV-338, 2018 WL 4134844, at *5 (E.D.N.C. July 13, 2018), *adopted by* 2018 WL 4113340 (E.D.N.C. Aug. 29, 2018). Although Social Security Ruling ("SSR") 96-9p addresses the use of a handheld assistive device by individuals capable of less than a full range of sedentary work, "district courts within the Fourth Circuit have consistently referred to [SSR 96-9p] for direction when a claimant alleges that the ALJ failed to properly consider the claimant's use of a hand-held assistive device in the RFC analysis." *Id.* (citing *Lovejoy v. Berryhill*, No. 2:17-CV-02921, 2018 WL 2729240, at *14 (S.D.W. Va. May 2, 2018), *adopted by* 2018 WL 2728032 (June 5, 2018)).

SSR 96-9p provides that an "RFC assessment must include a narrative that shows the presence and degree of any specific limitations and restrictions, as well as an explanation of how the evidence in file was considered in the assessment." S.S.R. 96-9p, 1996 WL 374185, at *5 (July 2, 1996). An ALJ must consider the impact of a "medically required hand-held assistive device." *Id.* at *7. For an ALJ to find that a handheld assistive device is medically required, "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." S.S.R. 96-9p, 1996 WL 374185, at *7 (July 2, 1996). A claimant's subjective

8

testimony that they require the use of a walker does not constitute "medical documentation" establishing such need under SSR 96-9p. *See Scottie J. D. v. O'Malley*, No. 1:23-CV-695, 2024 WL 2746799, at *6 (M.D.N.C. May 29, 2024) (citing *Hale v. Kijakazi*, No. 1:20-CV-277, 2021 WL 3625319, at *2 (W.D.N.C. Aug. 16, 2021) (holding that "[s]ubjective claims . . . are insufficient" to establish medical documentation of cane necessity required by SSR 96-9p)), *adopted sub nom. Scottie v. O'Malley*, 2024 WL 3498405 (M.D.N.C. July 22, 2024); *Thomas H. v. Berryhill*, No. 4:17-CV-41, 2018 WL 10806837, at *8 (W.D. Va. Aug. 27, 2018) ("The mere fact that [the plaintiff] sometimes presented to clinic appointments with a cane [ ] does not establish his underlying medical need to use that device."). Furthermore, "a prescription or the lack of a prescription for an assistive device is not necessarily dispositive of medical necessity." *Fletcher v. Colvin*, No. 1:14-CV-380, 2015 WL 4506699, at *8 (M.D.N.C. July 23, 2015) (citing *Staples v. Astrue*, 329 F. App'x 189, 191–92 (10th Cir. 2009)).

Here, the ALJ found that Claimant can perform light work, (R. 16–17), which requires up to six hours of standing or walking in an eight-hour workday, S.S.R. 83-10, 1983 WL 31251, at *6 (1983). The ALJ recounted Claimant's testimony regarding his standing and walking limitations and use of an assistive device, (R. 17), but did not account for them in the RFC, and provided the following explanation for not doing so: "While he reports needing a cane, cane use is not regularly demonstrated by exams, which typically describe him to have no significant gait abnormalities." (R. 20). Claimant now argues that there are several problems with the ALJ's rationale in this respect, namely that it (1) ignores the fact that Claimant's cane use may be intermittent but medically necessary nonetheless, and (2) mischaracterizes the record by downplaying the frequency with which Claimant's cane use is documented and failing to describe the circumstances in which it is used. Pl.'s Br. [DE-13] at 13–18.

9

After reviewing the record, the undersigned finds that no reversible errors were made by the ALJ with respect to Claimant's need to use a cane. In December 2022, two months prior to the alleged onset date, Claimant's physical therapist at the VA, Elmer Veracruz, noted the following when Claimant presented for a physical medicine rehab consult related to his left ankle: "PT ordered a medial arch support cushion and an SPC [single point cane] and provided it to pt to minimize pain in the Lle during ambulation indoor and outdoor." (R. 1226). From that point forward, Claimant appeared at many of his medical appointments ambulating with a cane. *See, e.g.*, (R. 18) (noting Claimant's cane use in April, May, June, and November 2023); (R. 407) (Claimant admitted to hospital for myocardial infarction and severe stenosis of the RCSA in June 2023, where it is mentioned in his treatment records that he "walks with cane"); (R. 446) (treatment note from May 12, 2023 reflecting that Claimant "presented to clinic with slow steady gait with a cane"); (R. 993) (VA clinic note from November 2023 indicating that Claimant "uses cane"); (R. 1148) (treatment note from March 2023 stating that Claimant ambulates with a cane); (R. 1164, 1170) (treatment notes from February 2023 where Claimant reported that he now has to use a cane); (R. 1179) (treatment note from January 2023: "Veteran ambulated to exam room slowly with assistance of cane."); (R. 1225) (physical therapy note from December 2022 indicating that Claimant was "limping on the LLE with cane"). However, Claimant did not always ambulate with a cane—and in fact, at many recent appointments his doctors specifically noted that he exhibited "no significant gait abnormalities" without one. *See, e.g.*, (R. 366) (treatment note from May 2023 indicating that Claimant exhibited "5/5 proximal upper and lower extremity strength. No significant gait abnormalities."); (R. 372, 558, 822, 1476, 1490) (treatment notes from January, August, and November 2023 and February and April 2024 stating same); (R. 1353, 1481) (December 2023 and February 2024 treatment notes from cardiologist

10

Case 5:24-cv-00511-FL-RJ     Document 16     Filed 08/26/25     Page 10 of 24

reflecting "no gait abnormality").

As Claimant emphasizes in his brief, the ALJ's decision does not address every single record reflecting that Claimant presented to a medical appointment with a cane. But despite Claimant's argument to the contrary, this omission is harmless because the undersigned can trace the reasoning supporting the ALJ's determination that "[w]hile [Claimant] reports needing a cane, cane use is not regularly demonstrated by exams, which typically describe him to have no significant gait abnormalities." (R. 20). As explained above, on balance, the available evidence indicates that Claimant appeared at many of his medical appointments with a cane. However, the evidence also arguably supports the assessment that Claimant regularly presented to medical appointments without an assistive device and nevertheless demonstrated no significant gait abnormalities on examination. The ALJ's difference of opinion with Claimant in this regard, as well as his failure to mention every potentially pertinent medical record, do not amount to a mischaracterization of the evidence simply because Claimant does not agree his ultimate assessment.

Where contradictory evidence exists in the record, is acknowledged by the ALJ, and the court can trace the reasoning supporting his decision to favor one interpretation of the evidence over another, it is not the court's job to second-guess that choice. *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) ("In reviewing for substantial evidence, [the court does] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ.") (citation omitted). Moreover, while the ALJ did not cite the exact evidence that Claimant has highlighted, he did cite evidence that is sufficient to support his assessment of Claimant's cane use. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) ("While the Commissioner's decision must contain a statement of the case, in

11

understandable language, setting forth a discussion of the evidence, . . . there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision.") (internal quotation marks and citations omitted). Thus, the court should find that the ALJ's analysis of the medical necessity of Claimant's cane is supported by substantial evidence. *See Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 383 (4th Cir. 2021) ("Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. Though the threshold for such evidentiary sufficiency is not high, it requires that more than a mere scintilla of evidence support the ALJ's findings.") (internal quotation marks and citations omitted).

The conclusion that remand is not warranted on this basis is bolstered by the fact that Claimant has failed to establish medical necessity for his assistive device. While Claimant correctly argues that an individual need not always use a cane for it to be deemed medically necessary, Pl.'s Br. [DE-13] at 14–15, the medical necessity determination requires documentation from an acceptable medical source establishing the need for an assistive device and describing the circumstances for which it is needed. S.S.R. 96-9p, 1996 WL 374185, at *7. In the instant case, Claimant presumably points to the treatment note made by his physical therapist, Mr. Veracruz, in December 2022 as the requisite medical documentation. *See* Pl.'s Br. [DE-13] at 15–16. Critically, though, a physical therapist is not an acceptable medical source, 20 CFR § 404.1502(a), and Claimant cites to no other record evidence that would even arguably constitute appropriate documentation under the Regulations. *See, e.g.*, Pl.'s Br. [DE-13] at 15 (citing medical records from February and March 2023 where Claimant was merely observed ambulating with a cane due to joint pain on examination); *id.* at 15–16 (citing notes from Claimant's physical therapist, Carlina Young, which reflect that Claimant was able to maintain modified independence on physical examination by using a cane with a widened base of support

12

and increased lateral sway). Accordingly, for all these reasons, the court should find that the ALJ's discussion of Claimant's assistive device, which does not deem the cane to be medically necessary or incorporate it into the RFC analysis, nevertheless provides for meaningful review. *See McNeill v. Saul*, No. 5:20-CV-244-M, 2021 WL 3701348, at \*7 (E.D.N.C. June 2, 2021) (citing *Matthews v. Berryhill*, No. 5:18-CV-60-D, 2019 WL 577427, at \*6 (E.D.N.C. Jan. 24, 2019), *adopted by* 2019 WL 572870 (E.D.N.C. Feb. 12, 2019); *Gilmer v. Berryhill*, No. 3:17-CV-539-FDW, 2018 WL 3518470, at \*2 (W.D.N.C. July 20, 2018) ("The claimant bears the burden of presenting 'medical evidence establishing the need for a cane and describing the circumstances for which it is needed.'") (quoting S.S.R. 96-9p)), *adopted by* 2021 WL 3686244 (E.D.N.C. Aug. 19, 2021).

## B. The Side Effects of Claimant's Prescription Medication and the Function-by-Function Analysis

Claimant contends that the ALJ, who ultimately determined that his statements concerning his current mobility limitations were not supported because, with additional medications, his rheumatoid arthritis activity declined to "low" by February 2024, disregarded the gastrointestinal side effects Claimant experienced on the more aggressive medication regimen. Pl.'s Br. [DE-13] at 19. Furthermore, Claimant argues that because the ALJ failed to consider the interplay between his rheumatoid arthritis treatment and gastrointestinal symptoms, by extension, he also failed to consider that when Claimant's rheumatologist, Dr. Christopher Tracy, started withholding medications in the hopes of providing Claimant with some gastrointestinal relief, Claimant's rheumatoid arthritis symptoms could increase again and affect Claimant's functioning like he testified at the hearing. *Id.* at 19–20. Thus, Claimant's side effect-related arguments necessarily implicate his arguments that the ALJ failed to perform a proper

13

function-by-function analysis of Claimant's ability to stand, walk, handle, finger, and feel, and the two are best discussed together. *See id.* at 18–23.

At the administrative hearing, Claimant testified that he takes Humira, methotrexate, folic acid, and Vitamin A to help his arthritis symptoms and stall disease progression, but even with these medications, the pain is "always there," and his joints are constantly stiff and swollen, which impacts his ability to walk, stand, grip things, and lift and carry objects. (R. 42–43). Claimant explained that while these medications have helped his arthritis symptoms, the side effects from them were "awful" at first. (R. 43). When asked what, if any, side effects he experiences now, Claimant stated the following: "Nausea. I'm always tired entirely and always tired and fatigued. I have like lightheadedness with the dizziness. I have chest pains but that could be coming from my heart. My heart issue that I have. But a lot of medicines do say chest pain." (R. 44). Subsequently, when asked if there were any additional medication side effects Claimant has dealt with besides those he previously mentioned, Claimant described that,

> For a while I had abdominal pain every day for like three or four months. Kept going back and forth to the doctor. They couldn't find nothing so they did an endoscopy and couldn't find – that's when they found polyps. But nausea always. Dizzy all the time. My head gets lightheaded if I bend down and I just come back up too quick. I'm ultra lightheaded. I'm fatigued every day. I'm fatigued now.

(R. 47–48).

The ALJ's decision briefly recounts Claimant's hearing testimony regarding his medication side effects; details that in December 2023, Claimant "reported discomfort and nausea associated with medication"; and adds that in February 2024, Claimant was

> seen with complaints of nausea, abdominal pain, and some vomiting. Notes also show concerns for gallbladder issues and stones (Ex. 13F). While he has presented to the emergency department for nausea, he benefitted from treatment and has other wise reported he does benefit from his prescription Zofran (Ex. 13F and 14F).

14

(R. 19); (R. 17–18) ("Medication side effects reported include nausea, fatigue, dizziness, and lightheadedness."). Additionally, in describing Claimant's mental impairments, the ALJ mentions comments Claimant made to his therapist in October 2023 regarding whether his nausea could be related to anxiety. (R. 20). Claimant now argues that this discussion is inadequate because the ALJ failed to "evaluate the significant, unbearable GI side effects Mr. Clayton was experiencing with this more aggressive medication regimen, which caused his doctor to start holding medications in hopes of providing him with some relief from his severe nausea (while recognizing that his RA erosive disease activity could ramp up again)." Pl.'s Br. [DE-13] at 18–22.

It is indisputable that an ALJ must consider the effects of a claimant's treatment. 20 C.F.R. § 404.1529(c)(3) (noting an ALJ must consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or [has] taken to alleviate [his] main or other symptoms" in evaluating a claimant's symptoms); *see also* S.S.R. 96-7p, 1996 WL 374186, at *3, 7–8 (July 2, 1996). The ALJ also must consider this same evidence when assessing a claimant's RFC. *See* S.S.R. 96-8p, 1996 WL 374184, at *5 (July 2, 1996) (discussing how a claimant's RFC must take into account "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)"). Thus, failure to appropriately consider a claimant's treatment may constitute error requiring remand. *See Riggs v. Berryhill*, No. 4:16-CV-11-F, 2017 WL 9478480, at *4 (E.D.N.C. Mar. 2, 2017) (citing *Fox v. Colvin*, No. 4:13-CV-53-D, 2014 WL 773714, at *10–12 (E.D.N.C. Feb. 5, 2014) (noting, during a discussion of the ALJ's consideration of opinion evidence, that the ALJ erred by failing to consider how the

15

intensity of claimant's treatment regimen, which included biweekly visits to his doctor and three home visits each week, and the side effects of claimant's medications impacted his ability to work), *adopted by* 2014 WL 773693 (E.D.N.C. Feb. 25, 2014); *Hickman v. Colvin*, No. 4:12-CV-288-FL, 2014 WL 652545, at \*6 (E.D.N.C. Feb. 19, 2014) (holding that the ALJ's failure to recognize and address the effects of claimant's medication "represent[ed] a violation of her fundamental duty to consider all the relevant evidence in the case" and constituted error requiring remand)), *adopted by* 2017 WL 1102620 (E.D.N.C. Mar. 24, 2017).

Here, a thorough review of the record shows that the ALJ's depiction of Claimant's medication-related gastrointestinal symptoms is mostly accurate. On August 16, 2023, Dr. Tracy noted, *inter alia*, that Claimant "completed prednisone taper with significant improvement [in] symptoms [and] now off prednisone symptoms have returned[.] [H]e has tolerated addition of Plaquenil based therapy but he continues to have shoulder elbow wrist bilateral involvement also knees and elbows." (R. 553). Consequently, Dr. Tracy recommended that "we treat his systemic disease more aggressively," *id.*, and detailed that Claimant should continue taking 400 mg of hydroxychloroquine daily; continue taking methotrexate, which would be increased from six to eight tabs weekly; and "plan to start Humira," (R. 559).

Shortly thereafter, on August 31, Claimant met with his primary care doctor, and it was noted that he had worsening nausea after a recent change in rheumatologic medication and had also experienced unintentional weight loss. (R. 692, 695). Accordingly, his primary care doctor scheduled an abdominal ultrasound to investigate these claims. (R. 695). In the interim, Claimant contacted the VA via telephone on September 1 requesting a gastroenterologist consult for nausea dating back 3 weeks and presented to the emergency room on September 29 with the chief complaint of ongoing nausea. (R. 899, 925, 931). Ultimately, an EKG, chest x-ray, and

16

routine labs taken while Claimant was in the hospital were all unremarkable and he was discharged. (R. 922, 926–27).

Claimant underwent the scheduled abdominal ultrasound on October 4, 2023, and tiny gallstones or polyps were noted in his gallbladder. (R. 697). It is unclear from the record what, if anything, was done about these issues, and throughout the month of October, Claimant continued to experience frequent bouts of ongoing nausea accompanied by dry heaving and occasional vomiting, which eventually culminated in him presenting to the emergency room on October 24 and 25. (R. 751, 772). At the second hospital visit, a CT scan was performed to determine the cause of Claimant's nausea, but the results were mostly unremarkable, and his discharge paperwork advises, "Ask your rheumatologist about whether you can stop your methotrexate or hydroxychloroquine, in which of these medications could potentially be causing your nausea." (R. 897, 1330). An esophagogastroduodenoscopy was also performed on October 30 to further investigate the cause of his gastrointestinal complaints. (R. 743). Then, a day after the procedure, Claimant met with his therapist, who detailed the following:

> [H]e is on several medications for Rheumatoid arthritis like Methotrexate, Hydroxychloroquine and Humira. He notes that he has been dealing with a lot of stomach pain and morning nausea. He notes that he sometimes doesn't eat his first meal until 5:00 pm due to his morning nausea. He notes that he had to go to the Emergency department twice over the past month because his nausea has been daily and very persistent. He notes that he just underwent an EGD. He reports that he noticed that his symptoms tend to be worse in the morning when his wife is at work and they get better in the afternoon when his wife is home. He is wondering if his physical symptoms like his nausea are related to his anxiety and mental health.

(R. 736).

In early November 2023, Claimant received the results of his esophagogastroduodenoscopy, which were negative. (R. 797, 866–67). He met with Dr. Tracy

17

again on November 20, and while there is no mention of nausea in any of the treatment notes from that appointment, Dr. Tracy detailed that he is "tolerating methotrexate 4 tabs weekly decreased from 6 tabs weekly with mildly increased ALT" and "tolerating Humira and hydroxy." (R. 817). Dr. Tracy also mentioned that Claimant reported "[n]o significant functional impact"; his significant disabling features due to arthritis pain had significantly improved, which increased his general ability to perform his activities of daily living; his all-day stiffness on presentation had significantly improved without significant functional disabling features less than 30; and his seropositive nonerosive rheumatoid arthritis inflammatory activity had lowered since he started Humira on October 1, to the point that he "certainly has had greater than 50% improvement." (R. 817–18, 823). Claimant was instructed to stop taking hydroxychloroquine, continue taking the decreased dosage of 4 methotrexate tabs per week, and continue taking Humira. (R. 823).

Later in November 2023, Claimant informed his care team at the VA that he was experiencing morning nausea after taking his medications without any food or drink, and the provider "discussed this as a source of nausea as well as the medications." (R. 726). Days later, on December 1, he met with his cardiologist, and at that appointment it was noted that he "reports ongoing nausea which was thought to be medication related and Brilinta was change to Plavix; statin has been stopped with plan to change." (R. 721, 797, 1352). However, when Claimant presented for his mental health medication management appointment on December 22, he reported that "everything is going good" and the "stomach bug" that he had, which had resulted in abdominal pain and unintended weight loss, seemed to be improving. (R. 1398–99).

Claimant saw Dr. Tracy a third time in February of 2024. At that appointment, Dr. Tracy noted that Claimant was still "tolerating" the lesser dosage of 4 methotrexate tabs per week, but

18

there remained a "concern that he is having significant breakthrough GI complaints so we discussed possible adverse side effect despite use of folic acid and Vitamin-A." (R. 1471). Dr. Tracy recorded that Claimant "has had low sustained disease activity with Humira methotrexate combination for his rheumatoid arthritis [and] given significant progressive GI side effects we discussed possible holding methotrexate to see if his GI symptoms improved," but added that Claimant "reports when he does not eat after 8:00 p.m. at night his symptoms do improve." *Id.* Ultimately, Dr. Tracy instructed Claimant to hold off on taking methotrexate for the time being but to continue taking folic acid daily, as well as his regular course of Humira. (R. 1477). The following day, when Claimant presented for his mental health medication management appointment, he told the provider that he has changed his diet and stops eating at 8 p.m. to give him a few hours to digest his food before going to sleep; his appetite is back; and he is back to 245 pounds but still does not get hungry until noon. (R. 1443). Finally, the most recent piece of medical evidence in the record is a hematology/coagulation progress note from April 2, 2024, where Claimant reported "feeling fine" and denied nausea, vomiting, and abdominal pain. (R. 1422).

As previously explained *supra*, it is ultimately the ALJ's responsibility to weigh Claimant's testimony about his limitations against the available evidence, here the longitudinal treatment records, and determine its credibility. *See Hancock*, 667 F.3d at 472. In the instant case, where the evidence suggests that Claimant's nausea has improved over time, the undersigned can trace the reasoning supporting the ALJ's statement that Claimant has benefitted from treatment. Critically, though, the path tracing the ALJ's reasoning is muddied by the fact that the decision completely neglects to mention an important reason *why* Claimant's nausea might have improved: Dr. Tracy's decision to halt Claimant's methotrexate because it might have been

19

causing or at least contributing to his nausea. *See* (R. 1477). The omission is a glaring example of cherrypicking, and it is not harmless. *See Lockerby v. Saul*, No. 1:19-cv-00159-MOC, 2020 WL 506752, at *3 (W.D.N.C. Jan. 30, 2020) ("An accurate and logical bridge must consider both favorable and unfavorable evidence"); *Jerome S. v. Kijakazi*, No. AAQ-22-02963, 2023 WL 5570201, at *4 (D. Md. Aug. 29, 2023) (finding ALJ erred by ignoring evidence regarding the severity of the plaintiff's pain) (citing S.S.R. 16-3p, 2016 WL 1119029, at *8); *Arakas v. Comm'r of the SSA*, 983 F.3d 83, 99 (4th Cir. 2020) (indicating that the ALJ erred in concluding that the plaintiff's symptoms were moderate "while omitting any mention of . . . various treatment notes from the relevant period indicating [the plaintiff]'s severe or worsening pain and fatigue")). Instead, it is an error warranting remand because while the ALJ might have had his reasons for discounting Dr. Tracy's treatment decision and its subsequent effects on Claimant's physical condition, that reason is not immediately clear from the record and its absence frustrates meaningful review. *See Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of no disability while ignoring evidence that points to a disability finding.") (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)).

The ALJ's failure to discuss Dr. Tracy's decision to halt methotrexate is significant for two reasons. First, at the administrative hearing, Claimant testified that he currently experiences a number of physical limitations from his rheumatoid arthritis. In addition to difficulties with standing and walking, Claimant testified that he was born left-handed and now "does not really have grip in that hand." (R. 42). According to Claimant, both of his wrists are "always hurting" and "always swollen"; he has trouble lifting and carrying weight to the extent that "if [he] bring[s] a gallon of milk from [his] driveway to [his] refrigerator which is 75 feet, 100 feet [he]

20

can't just lift it with [his] hand" and has to "cradle it kind of like a baby" instead; he has difficulty using both hands for repetitive tasks involving fine motor skills, like holding pencils, pens, and utensils, buttoning clothing, and typing, and when he does perform repetitive movements, it aggravates his symptoms and causes his hands to be extra sore and stiff later; when his wrist pain flares up, he is unable to drive; the range of motion in his left elbow has decreased, so he is unable to extend his left arm straight in front of him or reach under his head and straighten out the elbow; and he has to use a jar opener to compensate for his diminished grip strength. (R. 42–43, 49–51). There is no objective evidence discussing Claimant's arthritis symptoms after February 2024 that clearly refutes this testimony, and the evidence that is available indicates that while Claimant experienced overall improvement with his arthritis symptoms after starting Humira, all these improvements occurred while he was also taking methotrexate. *See, e.g.*, (R. 1471) (noting Claimant "has had low sustained disease activity with Humira methotrexate *combination* for his rheumatoid arthritis") (emphasis added). It is certainly feasible that, after stopping half of his arthritis medications, Claimant's rheumatoid arthritis symptoms resurged, improving his baseline nausea levels but negatively impacting his ability to stand, walk, handle, finger, and feel to the extent he testified to at the hearing. However, the ALJ's decision simply reflects that "evidence associated with his physical impairments supports improvement in his RA," without addressing Dr. Tracy's decision or explaining why the symptoms Claimant testified about are inconsistent with it. (R. 20). This is inadequate. *See Shelley C. v. Comm'r of the SSA*, 61 F.4th 341, 360 (4th Cir. 2023) (finding subjective statements from claimants "should be treated as evidence *substantiating* the claimant's impairment") (citing *Arakas v. Comm'r of the SSA*, 983 F.3d 83, 97–98 (4th Cir. 2020)).

Second, while the ALJ's decision recounts Claimant's hearing testimony regarding his

21

limitations, it does not specifically address his ability to stand, walk, handle, finger, and feel. *See* (R. 16–22). Normally, remand is not required when the ALJ's RFC analysis fails to explicitly discuss every part of the function-by-function analysis. *Ladda v. Berryhill*, 749 F. App'x 166, 172 (4th Cir. 2018); *see Mascio*, 780 F.3d at 636–37; *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016). However, the typical rule assumes that the ALJ has sufficiently explained his conclusions, adequately addressed the claimant's testimony about his impairments, and used all the relevant evidence in the record to explain the RFC finding, *see id.*, and as explained *supra*, here, that is not the case. Additionally, as the Fourth Circuit held in *Dowling v. Comm'r of the SSA*, remand is appropriate where the ALJ's decision does not fully analyze relevant, contested functions in assessing the claimant's RFC. 986 F.3d at 388–89. As the parties' briefing makes clear, Claimant's ability to stand, sit, handle, finger, and feel is undoubtedly uncontested, and there is record evidence supporting a finding for and against disability in this respect. Likewise, these functions are relevant because the RFC assessed necessarily invokes them by finding Claimant capable of light work, which involves a "good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls," 20 C.F.R. § 404.1567(b), and limiting him as follows:

> frequent pushing, pulling, operating hand controls, handling, fingering, feeling with the upper extremities; frequent pushing, pulling, operating foot controls with the lower extremities. Occasionally climbing ramps and stairs but no climbing ladders, ropes, or scaffolds. Occasionally balancing, stooping, kneeling, crouching, and crawling. Avoid all exposure to workplace hazards, such as dangerous moving machinery and unprotected heights.

(R. 16–17). Furthermore, at the administrative hearing, the VE testified that if Claimant's ability to use the upper extremity bilaterally for pushing, pulling, operating hand controls, handling, fingering, and feeling was limited to occasional only, that would preclude him from working at

22

the light exertional level; and that all three of the light work jobs identified would require some standing and walking while the person was managing their tasks and using two hands in most instances. (R. 54, 56). Thus, an impediment to Claimant's ability to walk, stand, handle, finger, and feel would likely preclude him from working. *See id.* Accordingly, remand is warranted for full consideration of the nausea treatment issue and its possible effect on Claimant's mobility-related symptoms.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that the final decision of the Commissioner be reversed and the matter be remanded for further proceedings.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **September 9, 2025** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C. Any response to objections shall be filed by within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the**

23

Memorandum and Recommendation without such review.  In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.  *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

Submitted, this the 26th day of August 2025.

Robert B. Jones, Jr.
United States Magistrate Judge

24